******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

R.S. SILVER ENTERPRISES, INC.
*v.* HENRY PASCARELLA ET AL.
(AC 34601)

Sheldon, Keller and Flynn, Js.

*Argued October 13, 2015—officially released February 9, 2016*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. Alfred J. Jennings, Jr., judge trial referee [judgment]; Lee, J. [judgment].)

*Wesley W. Horton*, with whom were *Kenneth J. Bartschi* and, on the brief, *Brendan J. O'Rourke* and *Daniel W. Moger, Jr.*, for the appellants (named defendant et al.).

*Hugh D. Hughes*, for the appellee (plaintiff).

*Opinion*

SHELDON, J. This breach of contract action, filed by the plaintiff, R.S. Silver Enterprises, Inc., against the defendants, Henry Pascarella and Riversedge Partners, returns to this court following our remand to the trial court for resolution of a jurisdictional challenge to the plaintiff's standing to prosecute this action, as pleaded in the defendants' twenty-first special defense. *R.S. Silver Enterprises, Inc.* v. *Pascarella*, 148 Conn. App. 359, 366, 86 A.3d 471 (2014). Pending resolution of that challenge, which was based upon the plaintiff's alleged assignment to a nonparty of its rights and interests under the contract it here claims that the defendants breached, we retained jurisdiction over and stayed further proceedings as to the defendants' remaining claims in their prior appeal. Id. On remand, the trial court, *Lee, J.*, rejected the defendants' jurisdictional challenge, finding that the plaintiff never assigned away its rights and interests under the contract here at issue. The defendants now challenge that determination, along with several earlier rulings by the trial court, *J. Downey, J.*, and *Hon. Alfred J. Jennings, Jr.*, judge trial referee, over which we retained jurisdiction pending the remand hearing. Because we agree with the trial court's rejection of the jurisdictional challenge presented in the defendants' twenty-first special defense, we must now reach and address those other challenged rulings on this appeal.

The other challenged rulings over which we retained jurisdiction involve alleged errors of two types. The first are alleged errors by the pretrial motions judge, *J. Downey, J.*, in striking certain of the defendants' special defenses. Specifically, the defendants challenge the trial court's orders striking: their second special defense, in which they alleged that the plaintiff is barred from pursuing this action as a matter of public policy because reinstatement of the plaintiff as a corporation by the Secretary of the State in order to pursue this case was made possible only by the plaintiff's defrauding of the Commissioner of Revenue Services; their fourth special defense, in which they alleged that the plaintiff is barred from pursuing this action as a matter of public policy because it engaged in bankruptcy fraud by entering into the contract here at issue; and their sixth special defense, in which they challenged the plaintiff's legal capacity to bring the instant action in 2006 on the ground that it was barred from obtaining reinstatement as a Connecticut corporation after 1994 pursuant to General Statutes § 33-995. Secondly, the defendants claim that the "judgment of the trial court is ineffective [because the court, *Hon. Alfred J. Jennings, Jr.*, judge trial referee, did not issue its final decision until] 966 days after the completion of trial in violation of General Statutes § 51-183b." We conclude that the trial court did not err in striking any of the challenged special

defenses. We also conclude that the defendants waived the time limitation set forth in § 51-183b, and thus that the date of issuance of the trial court's final decision does not make its judgment ineffective. Accordingly, we affirm the judgment of the trial court.

This court recited the following relevant factual and procedural history in deciding the defendants' prior appeal. "On April 28, 1997, the plaintiff entered into a 'participation agreement' with the defendants, under which the plaintiff invested $1,250,000 in a partnership formerly known as SPD Associates (SPD), and now known as Riversedge Partners, involving owning and managing a commercial building in Greenwich. Pursuant to that agreement, the plaintiff, in exchange for its investment, was given the contractual right to participate 'in any increase in the economic value' and 'future economic enhancement' of the building. More specifically, the agreement entitled the plaintiff to split equally all amounts received by the defendants in connection with the building after the making of certain priority payments.

"On October 11, 2006, the plaintiff commenced this action, alleging that the defendants had failed to split with it any amounts they had received in connection with the building, and, in fact, had never paid the plaintiff anything pursuant to the agreement. The plaintiff also sought an accounting of the business and affairs of SPD and alleged breach of fiduciary duty. In response, the defendants filed an answer and twenty-two special defenses. On August 19, 2008, the plaintiff filed a motion to strike all but two of the defendants' special defenses, in response to which the defendants filed an objection. On September 26, 2008, the plaintiff responded to the defendants' objection by filing a reply memorandum of law. On September 29, 2008, Judge Downey orally granted the plaintiff's motion to strike several of the defendants' special defenses, including the defendants' second, fourth, sixth and twenty-first special defenses, which are the subject of the defendants' appeal. In so doing, the court noted simply, without further explanation, that the special defenses it was striking 'are either not recognized under Connecticut law or are not appropriately drafted such that they would survive a motion to strike.' The court then stated: 'I adopt the foundation for my decision all the arguments advanced in [the plaintiff's] brief of August 19, [2008] and September 26, [2008]. . . .

"The case was then tried before Judge Jennings on various dates in early 2009. At the conclusion of trial, the defendants sought to withdraw their counterclaims, but the court, having determined that no good cause existed to permit the withdrawal, instead dismissed the counterclaims. The court ultimately rendered judgment in favor of the plaintiff on its breach of contract claim, awarding it damages in the amount of $1,782,848, plus

prejudgment interest in the amount of $819,475, for a total award of $2,602,323. The court ruled in favor of the defendants on the plaintiff's claims for an accounting and for breach of fiduciary duty. The defendants appealed and the plaintiff filed a cross appeal from the court's judgment on its breach of fiduciary duty claim. On April 17, 2013, the plaintiff withdrew its cross appeal, leaving only the defendants' appeal from the trial court's judgment on the plaintiff's breach of contract claim for our consideration." (Footnotes omitted.) *R.S. Silver Enterprises, Inc.* v. *Pascarella*, supra,148 Conn. App. 363–64.

As previously noted, this court remanded this case for adjudication of the jurisdictional challenge asserted in the defendants' twenty-first special defense. On remand, the trial court held hearings over several days, during which testimony and exhibits were presented, and the parties submitted posthearing memoranda. The court issued a memorandum of decision dated January 26, 2015, in which it concluded that the "plaintiff did not assign its right to payment under the [p]articipation [a]greement to Silver LLC, did not lack standing to sue, and accordingly, that the court has subject matter jurisdiction over this controversy." The defendants have appealed from that determination. Additional facts will be set forth as necessary.

I

We begin, as we must, with an examination of the defendants' claims that the plaintiff did not have standing to bring this action, and thus that the trial court did not have subject matter jurisdiction to hear it. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 511, 518–19, 970 A.2d 583 (2009) (when issue affecting court's subject matter jurisdiction raised, court is obliged to decide that issue before taking one step further to adjudicate other matters pending before it in the action). They have challenged the plaintiff's standing in two of their special defenses, the twenty-first and the sixth, which we will address in turn.

We begin by setting forth the applicable standard of review. "If a party is found to lack standing, the court is without subject matter jurisdiction to hear the case. Because standing implicates the court's subject matter jurisdiction, the plaintiff ultimately bears the burden of establishing standing. A trial court's determination of whether a plaintiff lacks standing is a conclusion of law that is subject to plenary review on appeal. We conduct that plenary review, however, in light of the trial court's findings of fact, which we will not overturn unless they are clearly erroneous. . . . In undertaking this review, we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . This involves a two part function: where the legal conclusions of the court

are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citations omitted; internal quotation marks omitted.). *Success, Inc.* v. *Curcio*, 160 Conn. App. 153, 162, 124 A.3d 563, cert. denied, 319 Conn. 952, 125 A.3d 531 (2015).

With these principles in mind, we turn to the merits of the defendants' two challenges to the plaintiff's standing, and thus to the trial court's jurisdiction.

A

We first address the defendants' challenge to the trial court's rejection of their twenty-first special defense, in which they alleged that before this action was commenced, the plaintiff had assigned to a nonparty its rights under the participation agreement, the contract which it claims in this action that the defendants breached. The defendants claim that the trial court erred in determining that the formation agreement, under which the plaintiff allegedly assigned its rights under the participation agreement to a nonparty, was clear and unambiguous, and that the plaintiff did not thereby assign its rights under the participation agreement to any other party. We are not persuaded by the defendants' arguments.

The following additional facts are relevant to this claim. In the defendants' prior appeal, this court decided that the trial court, *J. Downey, J.*, had improperly stricken the defendants' twenty-first special defense. In so concluding, we reasoned as follows: "In their twenty-first special defense, the defendants alleged the occurrence of a transaction that purportedly resulted in the transfer of all of the plaintiff's rights under the participation agreement to a third party. . . . A valid assignment transfers to the assignee exclusive ownership of all of the assignor's rights to the subject assigned and extinguishes all of those rights in the assignor. . . . If proven, the facts set forth in the defendants' twenty-first special defense would establish that the plaintiff had no right to sue the defendants for breach of the participation agreement. Because such allegations were not inconsistent with the allegations of the plaintiff's complaint, but, nevertheless, if proven, would have defeated the plaintiff's claims against them, the trial court improperly struck that special defense." (Citation

omitted; internal quotation marks omitted.) *R.S. Silver Enterprises, Inc.* v. *Pascarella*, supra, 148 Conn. App. 365–66.

On remand, the trial court made the following findings of fact.[1] "In late 1996 or early 1997, Robert Silver or an entity controlled by him accepted a real estate broker's commission of $2.5 million in settlement of a dispute relating to the real estate commission arising out of a project involving a company named 9 West in Stamford. . . . Henry Pascarella, who had represented Silver in the dispute as his attorney, introduced Silver [to] a $1,250,000 investment opportunity related to an office building at 200 Pemberwick Road in Greenwich, which Robert Silver had developed in the mid-1980s. Silver used half of the commission money received from the 9 West transaction to fund the Pemberwick investment. . . .

"On or about April 28, 1997, the investment was documented in a handwritten draft of the [p]articipation [a]greement, which recites that in return for the $1,250,000 investment, R.S. Silver & Company was assigned an economic interest in the anticipated restructured SPD Associates partnership (which owned the Pemberwick property), to be called the 'Silver Participation.' The Silver Participation required that certain preference or priority payments be paid first to Pascarella, who was a principal in SPD Associates. Thereafter, cash distributions from SPD were to be paid one-half to Pascarella and one-half to R.S. Silver and Company. . . . Section 3 of the [p]articipation [a]greement prohibits any sale, transfer or encumbrance of the Silver Participation without Pascarella's written consent, which he may give or withhold 'with or without any reason.' . . . Silver never requested or obtained permission from Pascarella to assign his interest in the [p]articipation [a]greement to anyone. . . . Silver provided some assistance with marketing the Pemberwick property to potential tenants, which he characterized as working for himself and Pascarella as owners. Pascarella did not pay him a commission for this work. . . .

"In 2001, Silver Co. needed an infusion of money to continue operating. Silver was introduced by Nick DeLuca, who had worked for Silver's company for fifteen years, to Robert Gillon, a successful, retired businessman, who was interested in investing and participating in a commercial real estate brokerage firm. . . . After several rounds of discussions, Silver, Silver Co. (referred to as 'Silvercorp'), Gillon and DeLuca entered into a [f]ormation and [c]ontribution [a]greement as of September 28, 2001 (the '[f]ormation [a]greement'). Pursuant to the [formation] agreement, the parties formed a limited liability company to be known as R.S. Silver & Co. LLC ('Silver LLC') to engage in the business of commercial real estate brokerage. Silver Co. was to change its name and to discontinue

the conduct of real estate brokerage 'except as may be necessary to wind up its affairs.' . . . Silver's capital contribution was described in Paragraph 2 and on Schedule A as customer files/lists, including databases and customer relationships, including 'the name 'R.S. Silver & Co.' and any variation and any goodwill associated therewith.' Robert Silver had been in the brokerage business for approximately forty years at the time. . . .

"Paragraph 8 of the [f]ormation] [a]greement provided: 'As of the effective date of this [a]greement, all commissions and other income resulting from the business of real estate brokerage conducted under the name of 'R.S. Silver & Co.' shall be paid to and belong to the LLC. However, as a transitional matter, the Parties agree to adjust the commissions payable on the following transactions if and when the commissions are earned and paid.' . . .

"Paragraph 9 of the [f]ormation [a]greement provided: 'The effective date of this [a]greement shall be September 1, 2001. This shall mean that any 'R.S. Silver' income or reasonable and necessary expense shall be adjusted between Silvercorp and the LLC as of such date.' . . .

"The [f]ormation [a]greement does not mention the Silver Participation in the [p]articipation [a]greement."

On examining the language of the formation agreement, the trial court on remand found that: "The language of the [f]ormation [a]greement must be interpreted on the strength of its language and the ordinary usage of its terms. It is uncontested that the agreement makes no mention of the [p]articipation [a]greement or the Silver Participation, although DeLuca testified that he was generally aware of it at the time of the execution of the [f]ormation [a]greement. The schedule of assets transferred by Silver Co. to the new LLC, contained in Paragraph 2 and Schedule A, does not include any reference to Silver's interest in the [p]articipation [a]greement.

"As a result, if transferred, the interest would have to be included in the general revenue flow assigned under Paragraph 8. As noted, that section provides that all commissions or other income resulting from the business of real estate brokerage conducted under the name R.S. Silver & Co. shall be paid to and belong to the LLC. Plainly, the payout from Silver's investment in the SPD partnership does not constitute a brokerage commission. As Judge Jennings found in the 2010 decision, at [page] 25, It is undisputed that the Silver Participation was not a partnership interest or an equity interest. . . . It is also undisputed that the Silver Participation was a contingent speculative investment. As noted by defendants, it might be encompassed by the phrase or other income, but the section limits its reach to income resulting from the business of real estate

brokerage conducted under the name of R.S. Silver & Co. However, the SPD partnership is not a brokerage business conducted by plaintiff. By contrast, the four carve-outs listed in Paragraph 8 involved potential revenue from plaintiff's real estate brokerage business.

"[The] defendants' assertion that the Silver Participation might be considered as arising from real estate brokerage because the money used to purchase it was earned as a commission from the 9 West transaction is not persuasive. Because Silver had spent his career earning brokerage commissions, this construction would put any asset or revenue of any kind purchased by Silver within the ambit of the clause, including stock dividends, the gain from the sale of his residence, or even lottery tickets.

"Paragraph 9 points away from this absurd conclusion. It apportions R.S. Silver income earned or expenses incurred prior to September 1, 2001, to Silver Co. and income earned or expenses incurred thereafter to Silver LLC. Because the 9 West commission was earned in 1997, it would remain with Silver Co. under Paragraph 9.[2] . . .

"In summary, the court concludes that the only reasonable construction of the language of the [f]ormation [a]greement is that the Silver Participation was not assigned by its terms.

"As a result of the foregoing, the court has found the relevant language of the [f]ormation [a]greement to be unambiguous and that it should be interpreted on the basis of its language and the circumstances of the transaction. [The] defendants assert that this is error and that they should have been allowed to present evidence of the parties' views on the purpose or meaning of the language of the agreement, but this testimony is not admissible in the face of unambiguous contractual language. Further, the court notes that, to the extent such testimony came in but was not credited by the court, it was self-serving and mutually contradictory. Silver was adamant that he did not assign the participation; on the other hand, DeLuca felt that everything was assigned. Gillon was unclear if he was aware of the [p]articipation [a]greement at the time of signing the [f]ormation [a]greement. As a result, [the] defendants cannot show prejudice from the court's ruling that the language of the [f]ormation [a]greement is not ambiguous with respect to whether the Silver Participation was assigned thereunder. With respect to [the] defendants' objection to the admission of the 2001 financial statement, the court advises that it gave no weight to that document in relation to the question at issue in this trial because it was not audited and the source of its information was not established. Because the court holds for [the] plaintiff on the meaning of the contract, it does not address [the] plaintiff's numerous alternative arguments. . . .

"By reason of the foregoing, the court concludes that the defendants have not satisfied their burden of proving by a fair preponderance of the evidence that the Silver Participation was assigned to the Silver LLC as alleged in the twenty-first special defense. Accordingly, their challenge to the jurisdiction of the court in these proceedings fails." (Footnote added; internal quotation marks omitted.)

The defendants now claim that the trial court erred in finding the formation agreement clear and unambiguous and that the plaintiff had not assigned to a nonparty its rights under the participation agreement. "It is well established that the determination as to whether language of a contract is plain and unambiguous is a question of law subject to plenary review. . . . If, however, the contractual language is found to be ambiguous, [s]uch ambiguity permits the trial court's consideration of extrinsic evidence as to the conduct of the parties. . . . [T]he trial court's interpretation of a contract, being a determination of the parties' intent, is a question of fact that is subject to reversal on appeal only if it is clearly erroneous. . . . Accordingly, our review is twofold. First, we must determine de novo whether the contractual language is ambiguous. If we conclude that it is, we must determine whether the trial court's factual findings are clearly erroneous.

"In determining whether a contract is ambiguous, the words of the contract must be given their natural and ordinary meaning. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *Perez* v. *Carlevaro*, 158 Conn. App. 716, 722-23, 120 A.3d 1265 (2015).

In support of their claim that the formation agreement was ambiguous,[3] the defendants, in their joint brief to this court, make the following assertions about the language of that agreement: "The key language in paragraph 1 is that the plaintiff will discontinue the conduct of a real estate brokerage business except as may be

necessary to wind up its affairs. . . .

"The key language in paragraph 8 is, all commissions, or other income resulting from the business of real estate brokerage conducted under the name R.S. Silver & Co. shall be paid to and belong to the LLC. . . .

"The key language in paragraph 9 is, any R.S. Silver income . . . shall be adjusted between Silvercorp [plaintiff] and the LLC as of such date [September 1, 2001]." (Citations omitted; internal quotation marks omitted.)

The defendants contend that "[t]he question is whether this language in paragraphs 1, 8 and 9 can reasonably be read to support this special defense," namely, that the plaintiff assigned its rights under the participation agreement to a third party. There is no language in the previously quoted provisions of the agreement, or, in fact, in the entire agreement, that explicitly states that the plaintiff assigned such contractual rights. Rather, to prove their case, the defendants parse the language of various phrases in the previously quoted provisions of the formation agreement, focusing on certain words or phrases, which, when read in isolation, might be claimed to suggest ambiguity. It cannot reasonably be doubted that, taken individually, various words or phrases taken from the subject language, such as "any" or "other," could be given differing interpretations, and thus, potentially, be considered ambiguous. When, however, those words or phrases are read, as they must be, both in the particular sentences in which they are used and considered in the broader context of the entire agreement, we agree with the trial court that they unambiguously did not assign any of the plaintiff's rights under the participation agreement to a third party. Instead, the plain language of the formation agreement makes it clear that that agreement is strictly a real estate brokerage agreement. Accordingly, it makes no mention whatsoever of the participation agreement. The trial court appropriately rejected the defendants' arguments to the contrary, and thereby properly determined that it did not lack subject matter jurisdiction over this action on the ground asserted in the defendants' twenty-first special defense.

B

The defendants also challenged the trial court's subject matter jurisdiction in their sixth special defense, wherein they claimed that the plaintiff lacked the legal capacity to bring this action because it should have been barred from reinstatement as a Connecticut corporation before this action was commenced. The plaintiff counters that the defendants have no standing to assert this jurisdictional challenge because they are not aggrieved by the Secretary of the State's reinstatement of it. We agree with the plaintiff.

"It is axiomatic that aggrievement is a basic require-

ment of standing . . . . If a party is found to lack [aggrievement], the court is without subject matter jurisdiction to determine the cause. . . . There are two general types of aggrievement, namely, classical and statutory; either type will establish standing . . . ." (Citations omitted; internal quotation marks omitted.) *Soracco* v. *Williams Scotsman, Inc.*, 292 Conn. 86, 91–92, 971 A.2d 1 (2009). "Classical aggrievement requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the [controversy], as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the [alleged conduct] has specially and injuriously affected that specific personal or legal interest. . . . [I]n cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. . . . [T]he existence of statutory standing . . . depends on whether the interest sought to be protected by the [plaintiffs] is arguably within the zone of interests to be protected or regulated by the statute . . . ." (Citations omitted; internal quotation marks omitted.) *Gillon* v. *Bysiewicz*, 105 Conn. App. 654, 659–60, 939 A.2d 605 (2008).

The defendants similarly challenged the reinstatement of R.S. Silver & Company, Inc., in a previous action in which they sought a declaratory judgment that the reinstatement had been based on a fraudulently induced statement by the Commissioner of Revenue Services to the Secretary of the State that back taxes owed by R.S. Silver & Company, Inc., had been paid. *Pascarella* v. *Commissioner of Revenue Services*, 119 Conn. App. 771, 772–73, 989 A.2d 1092, cert. denied, 296 Conn. 904, 992 A.2d 329 (2010). The plaintiffs named the Commissioner of Revenue Services, the Secretary of the State and R.S. Silver Enterprises, Inc., as defendants in the previous action. The trial court dismissed the action for lack of subject matter jurisdiction. On appeal, this court affirmed the judgment of dismissal, reasoning as follows: "The plaintiffs are defendants in an unrelated action brought against them in 2006 by the defendant, R.S. Silver Enterprises, Inc. . . . The plaintiffs claim that they are aggrieved because they are forced to defend a lawsuit against R.S. Silver Enterprises, Inc., and argue that R.S. Silver Enterprises, Inc., would not be able to maintain its lawsuit if it had not been reinstated by the secretary of the state. We review the plaintiffs' claim de novo . . . and conclude that the plaintiffs failed to provide evidence of aggrievement. The plaintiffs' participation in an unrelated lawsuit does not establish classical aggrievement, and this court has held that § 33-892 [the statute concerning reinstatement following administrative dissolution] does not extend statutory standing to third parties to challenge the general fitness of an applicant for reinstatement." (Citation omitted; footnotes omitted.) Id., 772–74.

On the basis of this court's prior determination that the defendants are not aggrieved by the reinstatement of the plaintiff following its administrative dissolution, they likewise lack standing to assert a challenge to the plaintiff's reinstatement as a special defense to this action. The trial court thus properly rejected this challenge to its subject matter jurisdiction.

## II

The defendants also claim that the trial court erred by striking their second special defense, in which they alleged that the plaintiff is barred from pursuing this action as a matter of public policy because reinstatement of the plaintiff as a corporation by the Secretary of the State in order to pursue this case was made possible by the plaintiff's defrauding of the Commissioner of Revenue Services; and their fourth special defense, in which they alleged that the plaintiff is barred from pursuing this matter as a matter of public policy because it engaged in bankruptcy fraud when it entered into the contract here at issue. We are not persuaded.

We begin by setting out the well established standard of review in an appeal from the granting of a motion to strike. "Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling . . . is plenary. . . . We take the facts to be those alleged in the [pleading] that has been stricken and we construe the [pleading] in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the [pleading] would support a [special defense], the motion to strike must be denied. . . . Moreover, we note that [w]hat is necessarily implied [in an allegation] need not be expressly alleged. . . . It is fundamental that in determining the sufficiency of a [pleading] challenged by a . . . motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Violano* v. *Fernandez*, 280 Conn. 310, 317–18, 907 A.2d 1188 (2006).

"Practice Book § 10-50, which sets forth the basic parameters for special defenses, provides: No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. Thus, accord and satisfaction, arbitration and award, coverture, duress, fraud, illegality not apparent on the face of the pleadings, infancy, that the defendant was non compos mentis, payment (even though nonpayment is alleged by the plaintiff), release, the statute of limitations and res judicata must be specially pleaded,

while advantage may be taken, under a simple denial, of such matters as the statute of frauds, or title in a third person to what the plaintiff sues upon or alleges to be the plaintiff's own." (Internal quotation marks omitted.) *R.S. Silver Enterprises, Inc.* v. *Pascarella*, supra, 148 Conn. App. 365.

A

The defendants claim that the trial court erred in striking their second special defense, in which they alleged that the plaintiff is barred from pursuing this action as a matter of public policy because reinstatement of the plaintiff as a corporation by the Secretary of the State in order to pursue this case was made possible only because of the plaintiff's defrauding of the Commissioner of Revenue Services. As explained in part I B of this opinion, and this court's previous decision in *Pascarella* v. *Commissioner of Revenue Services*, supra, 119 Conn. App. 771, the defendants lack standing to challenge the plaintiff's reinstatement. We thus conclude that the trial court properly struck the defendants' second special defense.

B

The defendants also claim that the trial court improperly struck their fourth special defense, in which they alleged that the plaintiff is barred from pursuing this matter as a matter of public policy because it engaged in bankruptcy fraud when it entered into the contract here at issue. In their brief to this court, the defendants explained this claim as follows: "The fourth special defense alleged, in clear and detailed terms set forth in twenty-three paragraphs, a series of facts demonstrating that [the] plaintiff wrongfully purchased its contractual right in the Participation Agreement using funds ($1,250,000) that had been pledged to Silver's bankruptcy creditors. . . . These allegations established a strong defense to [the] plaintiff's claims under the Supreme Court's decision in *Thompson* v. *Orcutt*, 257 Conn. 301, 777 A.2d 670 (2001), which holds that allegations of bankruptcy fraud constitute a cognizable unclean hands defense under Connecticut law." (Citation omitted; internal quotation marks omitted.)

"The doctrine [of unclean hands] generally applies [only] to the particular transaction under consideration, for the court will not go outside the case for the purpose of examining the conduct of the complainant in other matters or questioning his general character for fair dealing. The wrong must . . . be in regard to the matter in litigation. . . . Though an obligation be indirectly connected with an illegal transaction, it will not thereby be barred from enforcement, if the plaintiff does not require the aid of the illegal transaction to make out his case. . . . [S]ee . . . *Keystone Driller Co.* v. *General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293 (1933) (courts 'do not close their doors

because of [a] plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit, but only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication'); *Orsi* v. *Orsi*, 125 Conn. 66, 70, 3 A.2d 306 (1938) (clean hands doctrine prevents 'a party from asserting in court a title where, in order to do so, he must rely upon a transaction tainted with illegality or inequity'). In addition, the conduct alleged to be unclean must have been done directly against the interests of the party seeking to invoke the doctrine, rather than the interests of a third party. *Orsi* v. *Orsi*, supra, 69–70 ('[t]he wrong must be done to the defendant himself and must be in regard to the matter in litigation' . . . ." *Thompson* v. *Orcutt*, supra, 257 Conn. 310–11.

In the twenty-three paragraphs of their fourth special defense, the defendants never mention unclean hands. Rather, they allege that Silver defrauded the Bankruptcy Court and his creditors, and thus that the plaintiff is barred from maintaining this action because "[i]t is contrary to established public policy of the state of Connecticut for its courts to be used in furtherance of a fraud on the administration of a United States Bankruptcy Court by entertaining a Silver lawsuit based on funds Silver washed through a bank account controlled by Silver, in the name of the administratively dissolved entity R.S. Silver & Co., Inc., to hide a commission that Silver and his companies had assigned to Silver's creditors in the Bankruptcy Court." The twenty-three paragraphs of the defendants' fourth special defense contain allegations as to the factual circumstances that resulted in the plaintiff's alleged defrauding of Silver's creditors and the Bankruptcy Court. Other than asserting that Silver used funds that he had previously pledged to his bankruptcy creditors to fund his interest in the participation agreement, the defendants have not alleged any connection between their allegations of unclean hands and the plaintiff's breach of contract claim. There is no allegation as to how its special defense is connected to the allegations of the complaint or how the defendants allegedly were harmed by the plaintiff's alleged bankruptcy fraud. The origin or source from which the plaintiff obtained the funds for the participation agreement does not have any bearing on the plaintiff's breach of contract claim. We thus conclude that the trial court properly struck the defendants' fourth special defense.

III

Finally, the defendants claim that the trial court's judgment is "ineffective because it was issued 966 days after the completion of trial in violation of . . . General Statutes § 51-183b [which requires a court to issue a decision on a matter heard by it within 120 days from

the date of the end of the proceeding].” The plaintiff argues that the defendants waived the 120 day rule. We agree with the plaintiff.

The following additional procedural history is relevant to this claim. The trial in this matter was held on various dates in early 2009. The final posttrial brief was filed by the defendants on September 1, 2009, and the trial court declared the trial complete at that time and reserved its decision. Prior to the expiration of the 120 day period within which it was required to issue its decision, the court, through its court officer, asked the parties to extend the due date of its decision.[4] On December 24, 2009, less than one week prior to the statutory 120 day deadline, counsel for the defendant sent an e-mail to the court, wherein he stated: “I write to confirm our phone conversation. Mr. Pascarella and counsel to the defendants are happy to consent to an extension of the deadline for the pending trial court decision.” The plaintiff sent a similar e-mail to the court on December 30, 2009.

On June 4, 2010, counsel for the plaintiff sent an e-mail to the court clerk, with copies to all parties, inquiring as to the status of the decision in this matter. On June 9, 2010, the clerk responded to the inquiry, with copies to all parties, reporting that “[t]he court should have a decision in two weeks.” Again, on the morning of July 14, 2010, counsel for the plaintiff e-mailed the court clerk, with copies to all parties, asking when the court would be issuing its decision. The court issued its memorandum of decision later that afternoon.

In its July 14, 2010 memorandum of decision, the court found in favor of the plaintiff on its breach of contract claim—as to liability only—and in favor of the defendants on the plaintiff's breach of fiduciary duty claim.[5] As to the plaintiff's claim for damages for the breach of contract and its further claim for an accounting, the court explained that it was “unclear to the court at this point if the plaintiff [was] still seeking an accounting . . . to develop additional evidence on the issue of damages. For that reason, the court is not making any ruling on damages at this point, but will seek input from all parties as to the need for and purpose of further proceedings . . . . ” Accordingly, the court issued the following additional order: “Since, by agreement, proceedings on Count Two, seeking an accounting, were deferred pending the court's ruling on Count One, and judgment on liability only has now entered against the defendants on Count One for breach of contract, the plaintiff shall, not later than July 23, 2010, file a supplemental memorandum indicating whether or not further proceedings are requested on Count Two, and, if so, the scope of such proceedings contemplated by [the] plaintiff. [The] plaintiff is also requested, in view of the judgments which have entered,

to list in its memorandum each item in the 'Prayer for Relief' and the 'Demand for Relief' attached to the amended complaint of January 26, 2009, indicating which items of relief the plaintiff is presently seeking. The defendants may respond by August 3, 2010. After reviewing those memoranda the court will determine what further proceedings, if any, will be held prior to a determination of damages on Count One and the disposition of Count Two."

On July 23, 2010, the plaintiff filed a memorandum of law in response to the court's order, advancing its position that further proceedings were necessary on the matters as to which the court had reserved decision. On August 3, 2010, the defendants filed separate memoranda of law in response to the plaintiff's memorandum of law.

On August 13, 2010, the defendants filed a motion to set aside the decision and for a new trial pursuant to § 51-183b, arguing that their December 24, 2009 consent to the extension of the 120 day deadline had been a "limited purpose consent."[6] They argued that they had given their consent to an extension for the "whole" decision, "not just [a decision on] liability, with damages to be decided later." They further argued that their consent to an extension had been for a "reasonable time," but that 197 days, the amount of time that elapsed between the date of its consent and the date of issuance of the court's decision, was unreasonable. The plaintiff objected to the defendants' motion to set aside the decision and for a new trial on the ground that the defendants had waived the deadline imposed by § 51-183b and ambushed the trial court by waiting until after the court issued its adverse decision on the issue of liability before invoking the statute.

The court held a hearing on the defendants' motion on September 8, 2010. At the hearing, the parties presented their respective arguments to the court and agreed to the introduction into evidence of the previously described e-mails that had been attached to the previously filed motions. Because the defendants took issue with the court's statement that they had agreed that the plaintiff's claim for an accounting would be deferred to a later date, the court reserved its ultimate decision on the defendants' motion to give them time to order and examine the transcripts of all of the proceedings prior to trial to ascertain the accuracy of the court's determination in that regard. Despite its determination to reserve judgment on the defendants' motions, the court explained at length why it had taken 197 days after the expiration of the initial 120 day period to render its July 14, 2010 decision, noting its intensive workload and trial schedule while the decision was pending, in addition to the difficulty of the case and the voluminous record that it reviewed multiple times.[7] The court agreed that the defendants' December, 2009

consent to extend the 120 day period had been for a reasonable time, but disagreed that the additional 197 days that it took to issue its decision was unreasonable. The court continued the matter for four weeks, to October 6, 2010, to allow counsel for the defendants an opportunity to review transcripts from previous court proceedings[8] to ascertain whether the parties had in fact agreed to defer the plaintiff's claim for an accounting.

On October 6, 2010, the defendants filed a supplemental memorandum of law in support of their motion to set aside the trial court's decision and for a new trial.[9] Having reviewed the transcripts of the proceedings that occurred prior to the trial, counsel for the defendants reasserted their argument that there had never been an agreement to defer the plaintiff's claim for an accounting, and thus that the court's partial judgment of July 14, 2010, improperly purported to consider further proceedings on the accounting claim and the damages portion of the breach of contract claim.[10] The defendants also reiterated their claim that the additional period of time, from December, 2009, to July, 2010, had been objectively unreasonable. On November 5, 2010, the plaintiff filed a response to the defendants' supplemental memoranda of law in support of their motion to set aside the trial court's decision and for a new trial. In that response, the plaintiff argued that the trial court had properly exercised its discretion to bifurcate the accounting claim, and thus that the trial in the case had not yet concluded and that the 120 day period had not yet started to run. On December 15, 2010, Pascarella filed yet another supplemental memorandum of law. The court declared that briefing on the motion was closed on December 15, 2010.

On April 21, 2011, one week after the expiration of the 120 day deadline for the issuance of a decision on the defendants' motion to set aside the July 14, 2010 memorandum of decision and for a new trial, the defendants filed motions for mistrial as to the plaintiff's breach of contract claim and its accounting claim on the ground that the 120 day deadline for rendering judgment had passed and the court had not yet rendered judgment on those counts.[11] The plaintiff objected to the mistrial motion on the ground that the defendants' December, 2009 consent to extend the 120 day deadline had been an unconditional waiver of their rights under § 51-183b.

On March 23, 2012, the court issued an order rejecting all of the defendants' challenges to the timeliness of its decision. In its order, the court recounted the tortuous procedural history of this case, and found that "both defendants by virtue of [defense counsel]'s e-mail of December 24, 2009, had waived compliance with § 51-183b." The court explained: "Although [the] defendants attempt to differentiate between 'extension' and a 'waiver,' claiming that they had only agreed to some unspecified limited extension of time, there was no time

limitation, or any limitation, on the extension consented to. Under these circumstances, the defendants have given a blanket waiver of the statutory limit, which grants the court an 'unfettered' amount of time to decide the case. . . . Nor is there any authority for the argument made that the court's failure in the July 14, 2010 memorandum of decision to make an award of damages on Count One or adjudicate Count Two of the complaint seeking the remedy of an accounting started a new 120 [day] period commencing with the last filing of the supplemental briefs requested on those issues. There was evidence at trial on the issue of damages, but there was also Count Two asking for an accounting. The parties had agreed at the commencement of trial that Count Two was derivative of the breach of contract claim in Count One, that is, it would only come up if the court found for the plaintiff on Count One. No party briefed Count Two. The court was reluctant to issue an award of damages on July 14, 2010, because of the possibility that there could still be an accounting, which, if granted, would very likely lead to facts or evidence relevant to the issue of damages. Accordingly, the court deferred judgment on Count Two and ordered supplemental memoranda of law 'whether or not further proceedings are requested on Count Two and, if so, the scope of such proceedings contemplated by the plaintiff.' The plaintiff was also asked, in view of the judgments entered, to list in its memorandum each item in its 'Prayer for Relief' and 'Demand for Relief' of the amended complaint, indicating which items of relief it is presently seeking. The court concluded: 'After reviewing those memoranda the court will determine what further proceedings, if any, will be held prior to a determination of damages on Count One and the disposition of Count Two.' Under these circumstances, the filing of those supplemental memoranda between July 23 and October 6, 2010, did not start a new 120 day period. They were part of the original proceedings, covered by the waivers of December, 2009. . . . For the foregoing reasons, [the defendants' motions] are denied." (Citations omitted.) The trial court issued its final memorandum of decision on April 25, 2012, denying the plaintiff's request for an accounting and awarding damages to the plaintiff on its breach of contract claim.[12]

The defendants claim that the trial court's judgment is "ineffective because it was issued 966 days after the completion of trial, in violation of both . . . § 51-183b and minimally acceptable standards of judicial administration, and the defendants did not waive their right to reasonably prompt adjudication." Section 51-183b provides: "Any judge of the Superior Court and any judge trial referee who has the power to render judgment, who has commenced the trial of any civil cause, shall have power to continue such trial and shall render judgment not later than one hundred and twenty days

from the completion date of the trial of such civil cause. The parties may waive the provisions of this section." The 120 day period begins to run from the date that the parties file posttrial briefs or other material that the court finds necessary for a well reasoned decision. *Cowles* v. *Cowles*, 71 Conn. App. 24, 26, 799 A.2d 1119 (2002).

Generally, the first step in assessing the timeliness of a trial court's decision is to determine the completion date of the trial. The defendants argue that the completion date was the date on which posttrial briefs were filed, September 1, 2009. The plaintiff contends that the completion date was the date on which supplemental posttrial briefs were filed, December 15, 2010. The trial court's April 25, 2012 decision was issued well beyond 120 days from both of those dates. That is immaterial, however, if, as argued by the plaintiff and determined by the trial court, the defendants waived their statutory rights under § 51-183b by consenting unconditionally to the extension of the 120 day deadline in their December, 2009 e-mail to the court.

"[I]n order to reduce delay and its attendant costs, [§ 51-183b] imposes time limits on the power of a trial judge to render judgment in a civil case." *Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 691, 577 A.2d 1047 (1990). The court explained: "[T]he defect in a late judgment is that it implicates the trial court's power to continue to exercise jurisdiction over the parties before it. . . . [A] late judgment [i]s voidable rather than . . . void . . . and . . . the lateness of a judgment [may] be waived by the conduct or the consent of the parties. . . . Thus, if both parties simultaneously expressly consent to a late judgment, either before the judgment is issued, or immediately thereafter, the judgment is valid and binding upon both parties, despite its lateness. Express consent, however, is not required. If a late judgment has been rendered and the parties fail to object seasonably, consent may be implied." (Citations omitted.) Id., 692.

"Waiver is the intentional relinquishment of a known right. . . . Intention to relinquish [must] appear, but acts and conduct inconsistent with intention [to assert a right] are sufficient. . . . Thus, [w]aiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so. . . . Whether conduct constitutes a waiver is a question of fact. . . . Our review therefore is limited to whether the judgment is clearly erroneous or contrary to law." (Internal quotation marks omitted.) *Jacobson* v. *Zoning Board of Appeals*, 137 Conn. App. 142, 150, 48 A.3d 125 (2012).

The claim of express waiver in this case arises from the e-mail that the defendants sent to the court in December, 2009, in response to its request for an exten-

sion of the statutory 120 day deadline by which it was otherwise required to issue its decision. The defendants argue that in that December, 2009 e-mail, they agreed to "an extension of the deadline for the pending trial court decision"; (emphasis omitted); and that in so doing, they "agreed to a reasonable time within which the trial judge could render a complete decision. That extension did not confer upon the trial court the unilateral ability to extend itself, by piecemeal decision-making, an unlimited amount of time (until April 25, 2012) to render judgment." (Emphasis omitted.) There being no language in their e-mail that explicitly stated these purported terms of the defendants' consent, they ask that we read those terms into their communication to the court. The defendants have provided no authority for their suggestion that we read those conditions, which they easily could have included themselves, into their communication to the court. Indeed, in the cases in which there has been an agreed upon extension of the statutory time period, the extension in each of those cases was for a specified period of time, and the violation of that conditional extension precluded a finding of waiver in those cases. See *Cowles* v. *Cowles*, supra, 71 Conn. App. 24; *Building Supply Corp.* v. *Lawrence Brunoli, Inc.*, 40 Conn. App. 89, 669 A.2d 620, cert. denied, 236 Conn. 920, 674 A.2d 1326 (1996); see also *Santos* v. *Zoning Board of Appeals*, 144 Conn. App. 62, 71 A.3d 1263 (2013).

The defendants contend that waiver of the statutory time limit, an intentional relinquishment of a known right, is distinguishable from an extension of that time limit, which is defined as a "lengthening, furthering, developing." Although it cannot reasonably be disputed that those terms carry distinct meanings, when language consenting to an extension is not accompanied by any language of limitation or conditions, the difference between such an extension of a deadline and a waiver disappears. Thus, when an extension is unaccompanied by conditions or limitations, as in this case, it necessarily operates as a waiver.

In concluding that the defendants had waived the 120 day deadline in this case, the trial court explained that "the defendants have given a blanket waiver of the statutory limit, which grants the court an unfettered amount of time to decide the case." In so concluding, the trial court relied upon *Matthews* v. *Nagy Bros. Construction Co.*, 88 Conn. App. 787, 871 A.2d 1067, cert. denied, 274 Conn. 907, 876 A.2d 1199 (2005). In that quiet title action, which was tried to the court, "both parties unconditionally waived the 120 day time limit for the rendering of a decision." Id., 789. Almost fifteen months after the completion of the trial, the plaintiff filed a "Revocation of Waiver" and a motion for a mistrial, to which the defendant objected. Id. Neither the motion nor the objection was ever ruled on, and the court issued its decision almost two full years after

the completion of the trial. Id. On appeal, the plaintiff argued that the judgment was void because she had revoked her waiver of the 120 day deadline by filing her motion for mistrial before the court rendered judgment. Id., 790. This court disagreed with the plaintiff, explaining that "once a waiver of the provisions of a statute is made in a pending case, it is waived for the purposes of all further proceedings in the same action." (Emphasis omitted; internal quotation marks omitted.) Id., 791. In response to the plaintiff's argument that treating the waiver of the 120 day deadline as irrevocable frustrates the well established policy underlying that statute, which is to compel a prompt decision by the trial court, this court concluded: "Although the plaintiff may be correct that the unfettered amount of time that a waiver gives to a court in which to render judgment can be abused and, therefore, can frustrate the public policy underlying § 51-183b, revising the statute must be done by the legislature, not by this court." Id., 792. This court concluded: "We understand that the decision in this case was rendered approximately two years after the date of the trial. Although this is unfortunate, the plaintiff waived the right to receive judgment within the statutorily prescribed time. Additionally, she made a blanket waiver, not a conditional one allowing merely for an extension of a specified amount of time. Section 51-183b was created to discourage long delays in the rendering of judgments, but the legislature also provided that the parties could waive their right to a speedy judgment. We can find no reason to ignore the rule that rights once waived cannot be regained by revoking the waiver. . . . We conclude therefore that the plaintiff's attempted revocation of her waiver of the 120 day time limit and her filing of a motion for a mistrial did not void the judgment." (Citation omitted; internal quotation marks omitted.) Id., 792–93.

Although the defendants in this case do not contend that they waived and then revoked their waiver of the 120 day rule, *Matthews* is nevertheless instructive, in that it concludes that a waiver does permit a trial court "unfettered"; id., 792; discretion in issuing its decision, that there is no implied notion of reasonableness that accompanies a waiver, requiring or even permitting a court to examine newly asserted restrictions on the waiver. That is simply not provided for in the statute.

Here, then, because the defendants consented to an extension of the 120 day time period within which the court was required to issue its decision, and did not set forth any conditions or limitations on the agreed upon extension, the court's determination that they waived the 120 day rule was not clearly erroneous.[13]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although not all of the facts set forth by the trial court are relevant to our determination of whether it properly determined that the formation

agreement clearly and unambiguously did not provide for the plaintiff's assignment of his rights, we repeat some of them here to provide some context for the transactions at issue.

[2] The court also explained: "Further, the circumstances surrounding the [f]ormation [a]greement support the conclusion that the Silver Participation was not assigned thereunder. The [p]articipation [a]greement states that the Silver Participation may not be assigned without Pascarella's consent, which admittedly was not obtained. While [the] defendants claim that this language does not prevent the assignment under Connecticut law, the provision certainly provides support for the contention that it was not the parties' intent to commit an illegal act. Contrary to [the] defendants' contention, there is no evidence that Silver's payout was in any way linked to the performance of brokerage services for SPD at the Pemberwick property. Indeed, the testimony was that such services were limited, uncompensated, and in the nature of an effort to protect Silver's investment. [The] defendants argue that Gillon's receipt of a 70 percent interest for his investment of $250,000 supports the contention that the [p]articipation [a]greement was part of Silver's contribution to the LLC; however, on balance, it leads to the opposite conclusion. The income from the Silver Participation owing to Silver was found to be worth approximately $2.6 million, or more than ten times the amount of Gillon's contribution. Although Mr. Silver had not yet received any revenue from the Silver Participation as of the execution of the [f]ormation [a]greement, he was undoubtedly aware of the significant value of the Pemberwick property, as its developer and substantial investor."

[3] The defendants claim that the formation agreement was ambiguous and thus that the trial court should have permitted them to submit evidence of the meaning of the language of the agreement. Because this claim rests upon their contention that the formation agreement was ambiguous, which we reject, we do not reach this additional claim.

[4] The record does not reflect the date on which the court officer contacted the parties to request the extension of the 120 day period.

[5] We note that the trial court's July 14, 2010 memorandum of decision was fifty-three pages long. The defendants have not asserted any claims of error as to the substance of the trial court's July 14, 2010 decision.

[6] The defendants actually filed separate motions to set aside the decision and for a new trial, but counsel for Riversedge adopted and joined the brief filed by Pascarella. For clarity, we refer to the two motions as one.

[7] Specifically, the court noted that there were eleven days of evidence in the trial of this matter, and that it had reviewed the transcripts of the entire trial. The court further explained: "This was not an easy case to decide. This case was very, very hotly contested. It was a litigation between former friends, former partners and at least in some matters, former relationship of attorney and client.

"It was documented by unique documentation. And one of the key documents was a scribbled handwritten note that terminated—purported to terminate a one million dollar investment by the plaintiff—Mr. Silver sitting back there—with the words—I'm paraphrasing, it may not be exactly; but if Bob doesn't pay, Bob is out of the deal.

"With all this sophistication about partnership law and obstruction of contracts and everything else . . . that was what I had to work with. There was no precedent that I could find for many of these things.

"There was an issue of contract construction that was very challenging. This was not something that I was going to rush at. . . .

"The lapse of time did not mean that I was relying on memory for all of this evidence. I read the entire trial. Often I went back and read it multiple times and underlined the testimony.

"I read the briefs over and over. They're dog eared, the copies that I worked with. So, the lapse of time did not prejudice anyone in terms of the quality of review that was given to the evidence.

"I was not going to release an opinion until I was satisfied with it, until I was comfortable and confident that I had it right."

[8] This matter previously had been on the jury trial list and, in fact, voir dire had previously commenced and proceeded for a number of days, until the parties agreed to waive the jury trial and try the case to the court. Both the trial court and counsel for the plaintiff recalled that it was during those proceedings that the deferral of the accounting claim was discussed. Because Pascarella had hired new counsel since that time and his new counsel had not been present for those proceedings, those were the transcripts counsel sought to review.

[9] Again, Riversedge adopted the arguments set forth in Pascarella's supple-

mental memorandum of law. Riversedge set forth two additional arguments in their memorandum of law, neither of which pertained directly to the reasonableness of the length it took the court to issue its July 14, 2010 decision. The additional arguments set forth by Riversedge go to the merits of whether the plaintiff is entitled to an accounting and the need for the appointment of a receiver. Both of those arguments more properly should have been asserted on appeal from the judgment of the trial court.

[10] Again, this seems to be a challenge to the merits of the trial court's decision rather than a challenge to the reasonableness of the amount of time that it took the court to issue its decision.

[11] Although the defendants filed separate motions for mistrial, Riversedge adopted the arguments set forth by Pascarella in his motion.

[12] The trial court's April 25, 2012 memorandum of decision was twenty-four pages long. The defendants have not asserted any claims of error as to the substance of the trial court's April 25, 2012 decision.

[13] The defendants also ask this court to exercise its supervisory powers over the administration of justice to "require a new trial as a result of the inordinate and unjustifiable delay in the trial court." In light of our conclusion that the defendants waived any restrictions upon the trial court's time within which to render a decision in this case, we decline to exercise our supervisory powers to declare that the trial court's decision was untimely.